Angela Swan, Esq. 213793
The Law Offices of Angela Swan, APC
21151 S. Western Ave., Suite 177
Torrance. CA 90501
(310)755-2505
aswan@angelaswanlaw.com

Attorney for Plaintiffs, Angela Swan, The Law Offices of Angela Swan

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DISTRICT

| | |
|---|---|
| THE LAW OFFICES OF ANGELA SWAN, APC, AND ANGELA SWAN;  AND ROBERT CARR<br><br>Plaintiffs,<br><br>vs.<br><br><br>JP MORGAN CHASE & CO. D/B/A CHASE BANK; A CORPORATION, AND WELLS FARGO BANK, N.A. AND DOES 1-10<br><br>Defendants | Case No.:2:24-CV-01114-JLS-PD<br>Judge: Honorable  Josephine L Staton<br><br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES DEMAND FOR JURY TRIAL** |

Plaintiffs Angela Swan and The Law Offices of Angela Swan by and through their undersigned counsel Angela Swan, respectfully alleges for their First Amended Complaint and Jury Demand as follows:

## INTRODUCTION

On or about January 24, 2023, Angela Swan withdrew $60,000 out of her Interest on Lawyers' Trust Account (IOLTA) and purchased a cashier's check from Wells Fargo Bank.  On

that same day, Ms. Swan met with her client, Robert Carr, and gave the cashier check to Mr. Carr to represent his portion of a settlement.  Mr. Carr deposited his settlement check into his Chase account using the ATM machine located at the Chase bank in South Central Los Angeles. Immediately, Mr. Carr was not allowed access to the funds.  He immediately contacted his bank and he was told that the check was not negotiable because the funds were not available.  He was further advised that the check would be mailed back to Mr. Carr within a few days.

Mr. Carr immediately contacted his attorney, Ms. Swan, to inquire as to why the check was not negotiable.  Mr. Carr was advised by Ms. Swan that the check was guaranteed funds and the check was in fact negotiable.  Ms. Swan spoke to Chase Bank on several occasions and they advised that the check was non negotiable and that it would be returned to Mr. Carr.  Ms. Swan advised Chase that the check was negotiable because she was in fact the purchaser of the check and that she had paid $60,000 cash for the check.  Ms. Swan requested on several occasions, for almost two months straight, for Chase to return the check to Ms. Swan and or in the alternative to return the check to Mr. Carr.  Chase was not willing to return the check to Mr. Carr. Chase refused and ignored requests from both Ms. Swan and Mr. Carr to return or negotiate the check. Chase did not mail the check back to Mr. Carr or Ms. Swan, but in fact mailed the check to Wells Fargo approximately 120 days after Mr. Carr had deposited the check into the ATM.

Chase had absolutely no logical explanation for its actions of confiscating Mr. Carr's check..  This was clearly ridiculous and based on nothing more than the common phenomenon known as "Banking while Black"

Over the next few months February 2023-April 2023), both Chase and Wells Fargo encouraged Mr. Carr to contact Law enforcement and report Angela Swan for fraud and theft.

SECOND AMENDED COMPLAINT FOR DAMAGES DEMAND FOR JURY TRIAL
- 2

In Approximately February 2023, Ms Swan went to Chase Bank and spoke with Branch manager Mr. Malcolm.  Ms. Swan explained the story to Mr. Malcolm and he stated that he had been employed with Chase Bank for over twenty years and that Chase Bank should not be holding a cashier's check and not returning the check to its rightful owner.  Mr. Malcolm further explained that a cashier's check means that the funds are "guaranteed" He explained that this meant that a cashier's check was already paid and that it was immediately negotiable.  Mr. Malcolm apologized and said that unfortunately there was nothing that he could do.  He stated that the check was in the possession of the back office and that he could not control what happened.  He stated that only our banks customer service could help resolve this issue.

This experience was extremely frustrating.  It became difficult for Ms. Swan and The Law offices to adequately operate.  Daily, for approximately three months Ms. Swan was tasked with talking with Mr. Carr, Wells Fargo, Chase Bank, Attorneys, The State Bar, colleagues, doctors, and consumer protection agencies.

This experience not only took a toll on The Law Offices of Angela Swan, but also Ms. Swan's mental and physical health, and reputation.   Things took a turn for the worst when approximately one month after the incident, Mr. Carr contacted Ms. Swan and advised that he was on his way to the police department.  Ms. Swan's her heart sank.  Ms. Swan immediately stopped working and convinced Mr. Carr to meet me her at Wells Fargo.  Ms. Swan told Mr. Carr that she would meet him at the nearest Wells Fargo and together they could talk with Wells Fargo.

Upon talking to Wells Fargo to get the funds credited back to her account, Wells Fargo refused.  Instead, Wells Fargo made excuses as to why they would not and could not place a stop

payment on the check and return the funds to Ms. Swan.  The client, Mr. Carr was frustrated that he did not have access to his funds.

While at Wells Fargo with Mr. Carr, Swan and Carr were advised that the check had not been ran through any system and that there was no way to verify that the check was fraudulent. There was no attempt made on behalf of Chase to even verify the check.  Chase simply looked at the check and opined that it was fraudulent.  I received no phone calls or correspondence from Chase.

Approximately mid to late February 2023 I set up an appointment with Wells Fargo to attempt to have a bond issued on the check in the amount of $900.00.  Wells Fargo advised me that the bond was 900.00 and that a bond company would contact me within 24-48 hours.  The bond company did not contact me.  Instead, Wells Fargo contacted me and stated that the bond company would not accept the bond and that I would need to wait 90 days for a stop payment to be placed on the cashier check.  The bond company would not accept the bond because the check had been signed by Mr. Carr and was not being returned by Chase Bank.  I never spoke with the bond company.  I filed a complaint against Wells Fargo on March 2, 2023 and on or about March 23, 2023, Wells Fargo provided me with a response stating that I needed to report to one of its branches to purchase a surety bond.  This is an action that I had taken weeks earlier. This led me to believe that my complaint was not being taken serious and that no one actually looked into the matter as promised.  I simple received a dismissive respond to a serious issue.

Wells Fargo would not negotiate the cashier check, speak to Chase or take any actions. Chase Bank would not cash the check or return the check to Ms. Swan or to Mr. Carr.

The CA State Bar began an investigation on Attorney Swan based on Mr. Carr reporting the incident and Wells Fargo reporting  a negative balance in my IOLTA that they contributed to.

SECOND AMENDED COMPLAINT FOR DAMAGES DEMAND FOR JURY TRIAL

- 4

This investigation caused stress on Ms. Swan. She was constantly worried about obtaining the $60,000. No bank would assist with an explanation of where the money was. As a result of not having the money in the IOLTA account despite being told that the money would be placed in the account, a check bounced in the IOLTA. Wells Fargo contacted the State Bar and advised them of this bounced check. Wells Fargo did not advised the CA State bar that the check bounced due to the fact that Wells Fargo refused to clear checks based on the fact that $60,000 was in Ms. Swan's account.

Wells Fargo did not place the money in Swan account until approximately three months after Swan had purchased the check and demanded her money.

As a result, Mr. Carr lost confidence in the integrity of The Law Offices and Angela Swan. Mr. Carr refused to do any additional work with The Law Offices of Angela Swan and Angela Swan. Furthermore, Mr Carr filed a complaint with the bar, Wells Fargo filed a report to the bar knowing that my IOLTA was affected due to the money not being placed in my account. I suffered extreme emotional distress, and embarrassment due to the inability to access his settlement check for over three months. Over the twenty plus years that I have been a practicing attorney, I have never had a cashier's check not negotiated for a client and then a failure to return the check to me. I have a contract with Wells Fargo and I rely on this institution to assist me with promptly distributing funds to my clients. When I am not able to negotiate checks, I jeopardize my livelihood.

## JURISDICTION AND VENUE

## Chase Bank's Long History of Discrimination Against Black Customers

1.  Chase has a pattern of discriminatory treatment against its Black customers, giving

voice to the adverse consequences of "banking while Black."

2.    On December 18, 2021, Dr. Malika Mitchell-Stewart, a Black woman, attempted to deposit a $16,000 check. In response, Chase staff members accused her of fraud and questioned her employment as a doctor, denying her services.

3.    In 2019, a former NFL player named Jimmy Kennedy attempted to become a "private client" with Chase and was given "the run-around" more than once. He recorded his conversation with a Chase employee, who said that Mr. Kennedy was "bigger than the average person" and "also an African-American." The employee also said "[w]e're in Arizona…[t]hey don't see people like you a lot."

4. In a similar instance, also at an Arizona Chase bank, a Chase manager told a Black employee not to help a Black woman who received a $372,000 wrongful death settlement after her son died. The Black employee wanted to help the Black woman properly invest her money, however, his boss told the Black employee, "You've got somebody who's coming from Section 8, never had a nickel to spend, and now she's got $400,000. What do you think's going to happen with that money? It's gone." The Chase manager further added, "This is not money she respects. She didn't earn it."

5. Also, on April 25, 2019, Chase employees in White Plains, New York called the police on Mount Vernon, New York's Mayor Richard Thomas, a Black man, as the Mayor attempted to deposit a six-figure check and get access to the City's online banking records. Mayor Thomas believed that his race certainly played a role in the Chase employees calling the police.

6. Chase, in fact, admitted to receiving four complaints of racial discrimination since September 2021

7. Three of these complaints specify that they were made by Black customers.

8. Black customers complained that they were discriminated against with regard to cashing a check, restrictions on their account, being asked additional identifying questions, and not receiving promotional credit for opening an account.

9. Beyond Chase's customers, Chase has continued this discriminatory pattern with its own employees.

10. In 2018, Chase came to a $24 million settlement with financial advisors who were discriminated against because they were Black by assigning them to poorer bank branches, understaffing them, and not including them in a program for wealthy clients.

## JURISDICTION

1.  This Court has jurisdiction over this action pursuant to 28 U.S.C §§ 1331 (Federal Question) and 1368(c) (Civil Rights) and 42 USC Sect. 1981, 12 USC sect 4010(d).

2.  The State law claims for relief are within the supplemental jurisdiction of the Court, pursuant to 28 U.S.C §1367.

## THE PARTIES

3.  Plaintiff ANGELA SWAN is natural persons of mature age, and a private individual within the meaning of California law and is a citizen of the State of California, and at all times relevant hereto a resident of the County of Los Angeles, State of California.

4.  Plaintiff resides in the City of Carson.

## COUNT I
## DEFAMATION: SLANDER CALIFORNIA CIVIL CODE §46
*(by Plaintiffs Against all Defendants )*

5.  Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs.

SECOND AMENDED COMPLAINT FOR DAMAGES DEMAND FOR JURY TRIAL

- 7 -

6. This action is being filed pursuant to *Cal. Civ. Code §46* for slander, to redress injuries the Plaintiffs sustained when both defendnats claimed that Angela Swan and the Law Offices were attempting to scam Carr .

7. Slander is a false and unprivileged publication, orally, uttered, and also communications by radio or any mechanical or other means which […] tends directly to injure him in respect to his profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; or […] which, by natural consequence causes actual damage.

8. These allegations further harmed the business of Plaintiff because in the sake of Plaintiff losing clients and gaining a reputation of being a shady attorney, lacking integrity

9. The conduct of Defendants amounted to slander, thereby entitling Plaintiff to recover punitive damages.

10. Defendant falsely advised Mr. Carr that Swan had provided a fraudulent check to Carr.

11. Chase knew this to be a false statement, because according to Wells Fargo, the check had never been ran through the check system.  Chase further advised Carr to report Swan to the police.  While Swan was able to convince Carr not to go to the police, Swan was not able to prevent Carr from filing a complaint with the Bar.

12. The bank published this false statement by not only verbally telling Carr that the check was fraudulent and that Swan should be reported to the police, but Chase provided car with written documentation on his receipt and bank recording stating that the check was fraudulent and nonnegotiable.

SECOND AMENDED COMPLAINT FOR DAMAGES DEMAND FOR JURY TRIAL
- 8

13. Swan suffered damages to her reputation because Carr stated that he had other cases, but did not care to do business with Swan because she was dishonest and fraudlent.

## COUNT II

### TRADE LIBEL CACI § 1731

*(Against all Defendants)*

14. Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs.

15. To establish this claim, Plaintiff must prove all of the following: (1) That Defendants made a statement that [would be clearly or necessarily understood to have] disparaged the quality of Plaintiff's Foster Care business; (2) That the statement was made to a person other than Plaintiff; (3) That the statement was untrue; (4) That Defendants acted with reckless disregard of the truth or falsity of the statement; (5) That Defendants knew or should have recognized that someone else might act in reliance on the statement, causing Plaintiff's financial loss; and (6) That plaintiff suffered direct financial harm because someone else acted in reliance on the statement; (7) and That Defendants' conduct was a substantial factor in causing Plaintiff's harm.

16. The Defendants acted with reckless disregard for the falsity because without knowing the truth about Plaintiffs

## COUNT IV
## VIOLATION OF FOURTEENTH AMENDMENT: EQUAL PROTECTION RIGHTS
### *(by Plaintiffs Against all Defendants)*
### ***Race***

17. Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs.

SECOND AMENDED COMPLAINT FOR DAMAGES DEMAND FOR JURY TRIAL
- 9

18. This action is being filed pursuant to Fourteenth Amendment of the United States Constitution.

19. The Fourteenth Amendment states that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; [. . .] nor deny to any person within its jurisdiction the equal protection of the laws."

20. Plaintiffs have been treated different by the Defendants based on their race.

21. Defendants are financial institutions and provide a public service, and is a place of public accommodation.

22. Swan was denied the full and equal enjoyment of Defendants' goods, services, facilities, privileges, advantages, and or accommodations because of her race.

23. Swan's race and Mr. Carr race was the motivating factor in Defendants' decision to treat her less favorably than other individuals and refusal to cash and or place a stop payment on her funds.

24. Defendants' actions resulted in discrimination against Swan in the full utilization of or benefit of a financial institution or the services and activities provided by the financial institutions because of race.

25. Defendants' actions also resulted in discrimination against Swan in the terms, conditions, and privileges of a financial institution because of race.

26. Defendants' actions further resulted in denying Swan the full and equal enjoyment of the services, facilities, privileges, and advantages of public accommodations or public services, because of race.

27. Defendant, by its agents, representatives, and employees, was predisposed to discriminate on the basis of race, and acted in accordance with that predisposition.

28. Defendants' actions as described above were in deliberate disregard of and with reckless indifference to the rights and sensibilities of Swan

29. As a direct and proximate result of Defendants wrongful acts, Swan sustained injuries and damages including, but not limited to, outrage and humiliation, mental anguish, anxiety, physical and emotional distress, and loss of ordinary pleasures of everyday life.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(*by Plaintiffs Against All Defendants*)

30. Plaintiffs incorporate by reference each and every allegation contained in the above paragraphs.

31. This action is being filed pursuant to CACI § 1600 Intentional Infliction of Emotional Distress.

32. Infliction of Emotional Distress must plead facts demonstrating (1) that the Defendants conduct was extreme and outrageous; (2) that the Defendant intended to cause Plaintiff emotional distress; (3) that Defendants acted with reckless disregard of the probability that Plaintiff would suffer emotional distress, knowing that the Plaintiff was present when the conduct occurred; and (4) that the Defendants conduct was a substantial factor in causing Plaintiff's severe emotional distress.

33. Defendants engaged in extreme and outrageous conduct with the intent to cause Plaintiff emotional distress.

34. As a result of the conduct of the Defendant, Plaintiff has suffered economic, psychological, and emotional damages, and Plaintiff was obligated to retain legal counsel and to expend or incur liability for costs of suit, attorney's fees, and related

expenses in an amount not yet fully ascertained, but which will be submitted at time of

trial for recovery by Plaintiff's pursuant to Brandt v. Superior Court, (1985) 37 Cal.3d

813.

35. After Chase Bank refused to negotiate a cashier check. Chase refused to speak with me

on the phone or in person to clear up the check and allow the check to be negotiated.

Chase held the check for over 90 days and then finally mailed the check back to Swan's

Bank. I pleaded with Chase to give me the check because my livelihood was in

jeopardy. I attempted to advise Chase to at least provide me with the check or even a

copy of the check so that I could return the check to Swan's Bank.

36. Chase refused to even have any meaningful conversations with me.

## COUNTY VIII
## NEGLIGENCE
### (by Plaintiffs Against all Defendants)

37. Plaintiffs incorporate by reference each and every allegation contained in the above

paragraphs.

38. This action is being filed pursuant to California Negligence law.

39. The elements of actionable negligence, in addition to a duty to use due care, include a

breach of such duty, and the breach as the proximate cause of the resulting injury,"

*Musgrove v. Ambrose Properties*, 87 Cal. App. 3d 44, 53 (2nd Dist. 1978) (citing *United*

*States Liab. Ins. Co. v. Haidinger-Hayes*, I Cal. 3d 586, 594 (1970)).

40. Duty. A duty arises when the law recognizes a relationship between the defendant and

the plaintiff requiring the defendant to act in a certain manner, according to that

defendant's standard of care.

41. Defendants had a duty to act as reasonable person would under the circumstances. A reasonable person would not spread defaming, disgusting and untrue rumors about a complete stranger.

42. Reay was well aware of the consequences of her conduct, and she knew that her conduct was unreasonable under the circumstances.

43. Her conduct was so unreasonable in fact, that she later apologized to Plaintiff and "assured" him her conduct would not lead to the involvement of other Defendants (LA County and LACFS). (Exhibit A)

## COUNT IX
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
*(by Plaintiffs Against all Defendants)*

44. Plaintiff incorporates by reference each and every allegation contained in a;; the paragraphs above.

45. This action is pursuant to California Negligent Infliction of Emotional Distress (NIED).

46. In California, to recover from a NIED case a Plaintiff need to prove that (1) the defendant owed the Plaintiff a duty; (2) the Plaintiff suffered severe emotional distress and (3) the Defendants negligence was a substantial factor in causing the stress.

    Each Defendant owed a duty of care to Plaintiff as established above (Negligence).

47. In California, physical manifestations of stress are not required to be shown, distress may include suffering, anguish, nervousness, grief, worry and anxiety, shock, and/or humiliation.

48. Plaintiff is suffering from each symptom of stress listed above as a result of the conduct of the Defendants.

SECOND AMENDED COMPLAINT FOR DAMAGES DEMAND FOR JURY TRIAL
- 13

49.    The Defendants' negligence was a substantial factor in causing the stress, as established above (Negligence).

50. Plaintiff is informed and believes and thereon alleges, that said injuries will result in long term and perhaps everlasting anguish and trauma, all in addition to his general damages in an amount in excess of the jurisdictional minimum of this court to be proven at trial.

51. As a result of the Defendants' negligent, careless, reckless and unlawful conduct, Plaintiff suffers and will continue to suffer economic, physical and general damages the proven at trial.

## COUNT X
Race Discrimination in the Making of a Contract in Violation of 42 U.S.C.§ 1981
(*by Plaintiff Against all Defendants*)

52.  Plaintiff incorporates by reference each and every allegation in all paragraphs above.

53. Plaintiff  Swan is a member of a protected class based on her race

54. Plaintiff, Swan and Carr, are a Black persons, and belong to an identifiable class of persons who are subject to discrimination based on their race.

55. Defendants, Wells Fargo and Chase are a place of public accommodation that provides banking services to all members of the public.

56. Swan presented a check to Carr who in turn presented the check to Chase.  Chase refused to negotiate the check.  Wells Fargo was advised that the check was not being negotiated and refused to place a stop payment on the cashier check.

57. Wells Fargo further reported the actions to the CA State Bar

58. Swan didn't enjoy the privileges and benefits of the contracted experience because she was deprived of Defendants' banking services while similarly situated persons outside the protected class were not deprived of those services.

59. Swan did not enjoy the privileges and benefits of the contracted for experience because she received services in a dismissive manner in which the Defendants advised Carr to contact Law Enforcement.  A reasonable person would find this conduct objectively unreasonable

60. Defendants decisions to treat Swan less favorable than other individuals and to refuse to allow Swan's client, Carr, to cash a check was made based on Swan and Carr's race.

61.  Defendants acted knowingly and intentionally in discrimination against Swan and her client based solely on race.

62. Defendants' actions resulted in discrimination against Swan in the terms, conditions, and privileges of a financial institution because of race.

63. Defendants' actions as described above, were in deliberate disregard of and with reckless indifference to the rights and sensibilities of Swan

64. Defendants' discriminatory actions abridged Plaintiff's right to make and enforce contracts.

65.  Defendants actions in refusing to allow Carr to cash a check and further refusing to return the check to Swan, and Wells Fargo refusing to place a stop payment on the check, were profoundly contrary to Defendants' manifest financial interests, such that they constituted "marked hostility."

66. Defendants' actions were so far outside of widely-accepted business norms such that they constitute "marked hostility."

67. Defendants' actions in refusing to negotiate Swan's check and further failure to place a stop payment were so arbitrary on their face, such that they constitute "marked hostility."

68. As a direct and proximate result of Defendants' wrongful acts, Swan sustained injuries and damages including, but not limited to, outrage and humiliation, mental anguish, anxiety, physical and emotional distress, and the loss of the ordinary pleasures of everyday life.

**COUNT XI**
**BREACH OF CONTRACT**
**(by Plaintiffs Against Wells Fargo)**

69. Plaintiffs incorporate by reference each and every allegation in all paragraphs above.

70. "[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." Oasis W. Realty, LLC v. Goldman (2011) 51 Cal.4th 811, 821. 21. The Plaintiffs and Wells Fargo entered into an agreement, whereby Wells Fargo  promised and agreed to service and maintain an IOLTA against for the benefit of The Law Offices of Angela Swan. Yet, Wells Fargo failed to place a stop payment on a check that was loss, failed to provide a bond, failed to return money to Swan's account in a timely fashion, and failed to advise the bar correct information as to funds that were not in the account. Within the agreement that Swan and Wells Fargo entered into, there was no information stating that if the check was lost or stolen that there would be a 90 day waiting period (exhibit 1 copy of agreement)  The parties, for valuable consideration, entered a valid and enforceable contract. Swan was entitled to a stop payment on the check and the funds placed back

into her account once Swan notified Wells Fargo that the check was lost and or stolen by Chase.

71. As a direct and proximate result of Defendants' wrongful acts, Swan sustained injuries and damages including, but not limited to, outrage and humiliation, mental anguish, anxiety, physical and emotional distress, and the loss of the ordinary pleasures of everyday life.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff will ask for the following for each Cause of Action to be awarded:

**ALL CAUSES OF ACTION**

1. For Compensatory Damages in the amount of $15,000.000.00

2. For General Damages in the amount of $15,000.000.00

3. For Attorney's Fees and Costs of this action; and

4. Such further or additional relief as the Court deems proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

DATED: October 14, 2025

THE LAW OFFICES OF ANGELA SWAN, APC

By: _____/s/ Angela Swan_____

Angela Swan,
Attorney for Plaintiffs
Angela Swan and Law Offices of Angela Swan

SECOND AMENDED COMPLAINT FOR DAMAGES DEMAND FOR JURY TRIAL
- 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECOND AMENDED COMPLAINT FOR DAMAGES DEMAND FOR JURY TRIAL
- 18